[Civ. No. 20606. First Dist., Div. One. Mar. 6, 1963.]

CHARLIE CARRELL, Plaintiff and Appellant, v. FRED OLSEN LINE AGENCY, LTD., Defendant and Respondent.

Gladstein, Anderson, Leonard & Sibbett and Ewing Sibbett for Plaintiff and Appellant.

Lillick, Geary, Wheat, Adams & Charles, Mark Scott Hamilton and Peter N. Swan for Defendant and Respondent.

BRAY, P. J.—In an action brought under the provisions of the Longshoremen's and Harbor Workers' Compensation Act, plaintiff appeals from a judgment in his favor in the sum of $1,504.92.

## QUESTIONS PRESENTED

1. Is the finding of contributory negligence supported?
2. Are the damages inadequate?

## RECORD

The rule of comparative negligence obtains in this action. Plaintiff, a longshoreman, was injured by being struck on the head by a falling plank on board defendant's freighter MS Burrard. The action was tried without a jury. At the conclusion of the trial defendant's motion to amend its answer to plead contributory negligence on plaintiff's part was granted. The court found that the crew of the vessel was negligent but that plaintiff was equally at fault. Following the comparative negligence rule of admiralty law (see *Pope & Talbot, Inc.* v. *Hawn* (1953) 346 U.S. 406 [74 S.C.t 202, 98 L.Ed. 143] ; *Chelentis* v. *Luckenbach S.S. Co.* (1918) 247 U.S. 372 [38 S.Ct. 501, 62 L.Ed. 1171] ) the court mitigated

the damages by one-half, giving plaintiff judgment in the sum of $1,504.92.

1. *Contributory Negligence.*

August 22, 1956, plaintiff and other longshoremen were assigned to discharge cargo from the No. 3 hatch of the freighter. Before discharge commenced, the booms and guy wires had to be rigged, and plaintiff and others of his longshore gang were assigned to perform rigging on the port side of the superstructure of the ship. They noticed some of the vessel's sailors working overhead on a painting scaffold which was swung out over the side directly over an area where some of the longshoremen would necessarily have tasks to perform in connection with rigging the ship's gear. Upon request of the stevedore boss, the seamen ceased their painting operations and made the scaffold fast to the ship's side so that the gear could be rigged below. Union rules provided that no longshoremen might work while others were working overhead.

The longshoremen proceeded to rig the guy wires. After the rigging appeared to have been satisfactorily concluded the longshoremen went back to the No. 3 hatch. However, the rigging was not satisfactory and after seven to ten minutes the longshoremen returned to make further adjustments from a covered passageway below the scaffold and out of sight of the sailors above, who during the interval had resumed painting. Reaching for a guy line, plaintiff leaned out from the passageway. At this time the seamen were moving the scaffold and a plank serving as a platform on the scaffold fell, striking plaintiff, rendering him unconscious.

The court found that plaintiff in returning ''to the area immediately beneath the staging via a covered passageway from which he could not be seen by the sailors working above . . . did not warn the sailors of his return or look to see if the sailors had recommenced lowering the paint staging. Plaintiff then leaned outboard from under the protection of the covered passageway until his head and neck were beneath the staging.'' Plaintiff ''knew or should have known that the sailors might recommence lowering their paint staging after plaintiff and the other longshoremen left the area beneath it, and he knew or should have known that in sticking his head out beneath the staging there was danger of injury to his person. Plaintiff was negligent to a degree at least equal to the negligence of the vessel's crew.''

''As has so frequently been said, it is the general rule

that on appeal an appellate court (1) will view the evidence in the light most favorable to the respondent; (2) will not weigh the evidence; (3) will indulge all intendments and reasonable inferences which favor sustaining the finding of the trier of fact; and (4) will not disturb the finding of the trier of fact if there is substantial evidence in the record in support thereof." (*Berniker* v. *Berniker* (1947) 30 Cal.2d 439, 444 [182 P.2d 557].) There is such substantial evidence here. Plaintiff testified that he looked up when he went to reach for the guy line and saw no one near the scaffold. However, longshoreman Wheeler testified that when plaintiff and he went into the ship's passageway they could not see whether the sailors had returned. "We took it for granted they were still standing by. . ." They called to the sailors "to hold it" and in that instant the scaffold came down. Longshoreman Thomas, who was working with plaintiff, saw the accident. When asked if he saw plaintiff at any time look overhead or check to see whether the sailors had gone back to work painting, said, "We didn't look up above." Later he directly answered that he did not see plaintiff look up and "all I saw was Mr. Carrell rigging the gear." Wheeler testified that the plank fell in the same instant that plaintiff and Wheeler called out. A reasonable inference which the court could draw from the testimony was that plaintiff knew or should have known that the seamen might return to work as soon as the longshoremen left the area below the scaffold, that because plaintiff was returning to work through the covered passageway the seamen would not be able to see him. Further, plaintiff could have looked out cautiously a few feet further down the companionway and out of the danger zone, and could have waited for an acknowledgment of the shouted warning before leaning out under the scaffold. Being aware of the dangerous condition overhead, it is not unreasonable to hold that plaintiff did not perform the duty required of him to exercise due care to protect himself.

2. *Damages Adequate.*

 The evidence supports the court's finding that plaintiff was damaged only in the sum of $3,009.84 (the amount which would have been awarded if there were no contributory negligence).[1] The court further found that plaintiff's injury from the accident was only minor injury to his head and neck; that plaintiff has had a long history of accidents,

---

[1] All plaintiff's medical expenses were covered by insurance or compensation.

disabilities and treatment to his head, neck and back unrelated to the present accident; that he requires no additional diagnostic procedures and no additional treatment; that he may continue longshore work at least on the dock; and that his only loss of earnings was $1,009.85 during the 26-week period immediately after the accident.

Plaintiff testified that some five years after the accident he still had sharp pain in the neck, shoulders and ears and suffered from headaches and dizziness, and that because of the pain he works only three days a week; also that since the accident he was unable to do the heavy and more plentiful work of a "hold man" aboard ship. However, it appears that he had worked aboard ship since the accident. Moreover, since the accident he has incurred three other head injuries while doing so. In June 1957 he was hit on the head by a cargo hook; in October 1957 he hit his head on a metal shelf, and in January 1959 he was hit on the head by a crowbar. All of these required medical treatment. This series of subsequent injuries, while none of them appeared to be major, obscure the causative chain linking plaintiff's present complaints to the injury of August 1956.

It is also notable that plaintiff's inability to do heavy work appears in large part to stem from a series of back injuries unrelated to the 1956 injury. These occurred in 1950, 1952, 1958, and 1959. After the 1959 *back* injury plaintiff was given a medical exemption from doing heavy work.

The only medical testimony was that of plaintiff's physician, an orthopedic surgeon, who examined plaintiff in January 1961. (The trial was in August.) Although the doctor testified that in his opinion plaintiff's complaints with reference to his head and neck were attributable to the accident in question he also testified that his examination showed plaintiff to be a healthy, well-developed individual who displayed no objective signs of injury, recent or old, and no deformities or abnormalities. X-ray films indicated an arthritic condition which, in the doctor's opinion, might have antedated the 1956 injury. The doctor's "guarded" prognosis was that plaintiff should be cautious about heavy work and that it was impossible to say how long the headaches would last. The doctor also stated that the examination indicated that plaintiff had been working steadily, showing no muscular atrophy. It should be noted that plaintiff failed to disclose to the doctor the other head injuries. Plaintiff attributed this to a defective memory stemming from the 1956 injury.

As to loss of wages, plaintiff's testimony indicated that he lost approximately $1,400 in wages on account of the 1956 injury, since he was unable to work, according to him, for two or three months. Computations based on average quarterly earnings show that plaintiff's loss in the 26-week period following the accident would have been about $1,000. Plaintiff's pattern of yearly earnings shows that his income did not begin to diminish until 1959, some three years after the accident involved here and after several other injuries. Actually in 1957 and 1958 his earnings were greater than they were in 1955, and his earnings in 1956, the year of his injury, in spite of losing 26 weeks of work, were greater than in 1955. In the tabulation of hours worked per year, no marked decrease is evident until the last quarter of 1958 and the third quarter of 1959, after the aforementioned intervening injuries.

It therefore seems reasonable to attribute the later losses to the intervening injuries, particularly the back injury on account of which plaintiff went on light duty. This is apparently what the trial court did. ▆▆ ''[T]he plaintiff has the burden of proving, with reasonable certainty, the damages actually sustained by him as a result of the defendant's wrongful act, and the extent of such damages must be proved as a fact.'' (*Chaparkas* v. *Webb* (1960) 178 Cal.App.2d 257, 259 [2 Cal.Rptr. 879].) Plaintiff failed to prove more damages than those found by the court.

In any event, it cannot be said that the award is so meager that it shocks the conscience and is inadequate as a matter of law (cf. *Wilson* v. *City & County of San Francisco* (1951) 106 Cal.App.2d 440, 443 [235 P.2d 81]) or that there is no substantial evidence to support the court's findings.

The judgment is affirmed.

Sullivan, J., and Molinari, J., concurred.